Michael CHANDLER, individually and as next friend of his son, Jesse Chandler;  Jane Doe, individually and as next friend of her daughter, Deborah Doe;  Plaintiffs-Appellees,

v.

Don SIEGELMAN, in his official capacity as Governor of the State of Alabama and President of the State Board of Education, Bill Pryor, in his official capacity as Attorney General of the State of Alabama, Defendants-Appellants.

Nos. 97-6898, 97-6953.

United States Court of Appeals,

Eleventh Circuit.

Oct. 19, 2000.

Appeals from the United States District Court for the Middle District of Alabama. (No. 96-00169-CV-D-N), Ira De Ment, Judge.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES.

Before TJOFLAT, GODBOLD and HILL, Circuit Judges.

HILL, Circuit Judge:

In 1999, we unanimously vacated the Permanent Injunction entered by the district court in *Chandler v. James,* 180 F.3d 1254 (11th Cir.1999)(Chandler I).  We also denied plaintiffs-appellees' petition for rehearing.  No judge requested a vote on a rehearing en banc, and the mandate issued.  Plaintiffs then filed a petition for certiorari with the Supreme Court (--- U.S. ----, 120 S.Ct. 2714, 147 L.Ed.2d 979 (2000)).

On June 19, 2000, the Supreme Court issued its decision in *Santa Fe Independent School District v. Doe,* --- U.S. ----, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).  On June 26, 2000, the Supreme Court granted the petition for certiorari in *Chandler I,*[1] vacated our judgment, and remanded the case to us for further consideration in light of *Santa Fe.* The case was returned to us on September 1, 2000.

We have completed our review of *Chandler I* and have concluded that it is not in conflict with the Supreme Court's decision in *Santa Fe.* Accordingly, we will reinstate our opinion and judgment in *Chandler I.* We take this opportunity, however, to explain how *Chandler I* fits within the Supreme Court's analysis in *Santa Fe* so that the district court may have this guidance when it revisits its injunction.

I.

*Santa Fe* condemns school *sponsorship* of student prayer.  *Chandler* condemns school *censorship*

---

[1]Pursuant to Rule 43(c)(2), Fed. R.App. P., Governor Don Siegelman was automatically substituted as a party for his predecessor in office, former Governor Fob James.  The case is now styled *Chandler v. Siegelman.*

of student prayer.  In their view of the proper relationship between school and prayer, the cases are complementary rather than inconsistent.[2]

In *Santa Fe,* the Supreme Court reaffirmed that the Establishment Clause of the First Amendment prohibits a school district from taking affirmative steps to create a vehicle for prayer to be delivered at a school function.  120 S.Ct. at 2279.  This principle has been established for more than thirty years.  *Engel v.. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).  The Court applied that principle to hold that Santa Fe's policy of allowing students to vote on whether to have prayer before football games constitutes such an affirmative step.  *Id.* at 2277.

Several facts were critical to this holding.  First, the school board adopted the following policy:

> The board has chosen to permit a student to deliver a *brief invocation and/or message* to be delivered during the pre-game ceremonies of home varsity football games to solemnize the event ...

*Id.* at 2273.  Second, the school board instituted its policy by establishing a two-step election process.  First, students vote on whether to have an invocation or message prior to football games.  If so, a second election is held to choose a student to do so.  *Id.* Only that student may speak at the game, and the same student delivers the message at each game.  *Id.*

In view of these facts, the Court rejected *Santa Fe's* argument that it was merely providing a neutral accommodation of private religious speech.  *Id.* at 2277.  The Court found significant that the school policy "approve[s] of only one specific kind of message, an 'invocation.' "  *Id.* Under these circumstances, the Court concluded that "the District has failed to divorce itself from the religious content in the invocations," and has crossed the line from state *neutrality* toward religion to state *sponsorship* of religion.

The fatal flaw in the Santa Fe policy was its attempt to disentangle itself from the religious messages by instituting the student election process.  Santa Fe thought it could satisfy the constitutional requirement for neutrality toward religious speech by allowing such speech to be chosen by the majority.  In the Court's view, however:

> Santa Fe's student election system ensures that only those messages deemed "appropriate" under the District's policy may be delivered.  That is, the majoritarian process implemented by the District guarantees, by definition, that minority candidates will never prevail and that their views will be effectively silenced.

*Id.* at 2276.  Such a policy, the Court concluded, substitutes the views of the majority for the government

---

[2]Furthermore, *Santa Fe* is limited to the issue of school-sponsored student speakers over public address systems at official school events.  The activities prohibited by the Permanent Injunction entered in *Chandler I* are far more extensive.

neutrality required by the Establishment Clause. Thus, it violates the very raison d'être of the Establishment Clause—protection against the tyranny of a religious majority. *Id.* at 2277.

Consequently, the policy is not a *neutral* accommodation of religion. On the contrary, "the realities of the situation plainly reveal that [the District's] policy involves both perceived and actual *endorsement* of religion." *Id.* at 2277. The " 'degree of school involvement' makes it clear that the pre-game prayers bear 'the imprint of the State.' " *Id.* (quoting *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)).

Because the prayers bear the imprint of the State, they cannot be characterized as "private" speech protected by the Free Exercise and Free Speech Clauses. The Court held:

> The delivery of such a message—over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer—*is not properly characterized as "private" speech.*

*Id.* at 2279 (emphasis added). Since the religious speech produced by Santa Fe's policy is sponsored by and, therefore, attributable to the school, it constitutes an unconstitutional endorsement of religion by the State.

## II.

Although the policy at issue in *Santa Fe* involved student-led invocations on school property at school-sponsored, school-related events, the Court was careful to point out that "*not every message delivered under such circumstances is the government's own.*" *Id.* Thus, *Santa Fe* does not obliterate the distinction between State speech and private speech in the school context. It does not reject the possibility that some religious speech may be truly private even though it occurs in the schoolhouse. Nor does it hold that all religious speech is inherently coercive at a school event. On the contrary, the prayer condemned there was coercive precisely because it was *not* private. 120 S.Ct. at 2277. The Court's holding in *Santa Fe* is only that State-sponsored, coercive prayer is forbidden by the Constitution.

Furthermore, *Santa Fe* explicitly reaffirms the basic principle that "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." 120 S.Ct. at 2275 (quoting *Board of Ed. v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)).[3] *Santa Fe* leaves unanswered, however, under what circumstances religious speech in schools can be considered *private,* and, therefore, protected. This is the answer *Chandler I* sought to supply.

---

[3]As we said in *Chandler I,* "[r]eligious speech by students does not become forbidden 'state action' the moment the students walk through the schoolhouse door." 180 F.3d at 1261-62.

In *Chandler I,* we were asked to review an injunction which assumed that virtually any religious speech in schools is attributable to the State. While the district court recognized that a student must be allowed to pray *silently* while in school, or even discuss his religious beliefs *quietly* with others, it enjoined the school district from *permitting* any prayer in a *public* context at any school function.[4] We held that this injunction was overbroad to the extent that it equated all student religious speech in any public context at school with State speech. In so doing, it eliminated any possibility of *private* student religious speech under any circumstances other than silently or behind closed doors. This the Constitution neither requires nor permits. The Establishment Clause does not require the elimination of private speech endorsing religion in public places. The Free Exercise Clause does not permit the State to confine religious speech to whispers or banish it to broom closets. If it did, the exercise of one's religion would not be free at all.

It is not the public context that makes some speech the State's. It is the entanglement with the State. What the Court condemned in *Santa Fe* was not private speech endorsing religion, but the delivery of a school-sponsored prayer. Remove the school sponsorship, and the prayer is private. In *Chandler I,* we held that such prayer must be permitted.

Therefore, if "[n]othing in the Constitution ... prohibits any public school student from voluntarily praying at any time before, during, or after the school day," *Santa Fe,* 120 S.Ct. at 2281, then it does not prohibit prayer aloud or in front of others, as in the case of an audience assembled for some other purpose. *Chandler I,* 180 F.3d at 1261. So long as the prayer is *genuinely student-initiated,* and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected:

> Permitting students to speak religiously signifies neither state approval nor disapproval of that speech. The speech is not the State's—either by attribution or by adoption. The permission signifies no more than that the State acknowledges its constitutional duty to tolerate religious expression. Only in this way is true neutrality achieved.

*Id.* As we said in *Chandler I,* a policy which *tolerates* religion does not improperly *endorse* it. 180 F.3d at 1261.

Private speech endorsing religion is constitutionally protected—even in school. Such speech is not the school's speech even though it may occur in the school. Such speech is not unconstitutionally coercive even though it may occur before non-believer students. The injunction entered by the district court in this

---

[4]For example, the Permanent Injunction permits students to "quietly engage in religious activity during non-instructional times, so long as it does not unduly call attention thereto." *Chandler I,* 180 F.3d at 1260 n. 10.

case proceeded on a contrary assumption and we reaffirm our directive that it must conform its requirements to the Constitution. We directed the district court to revisit its injunction in order to ensure that it did not command the school district to actively prohibit—censor—genuinely student-initiated religious speech, and we do so again.

III.

The Permanent Injunction enjoins the school district from "aiding, abetting, commanding, counseling, inducing, ordering, or procuring" school organized or officially sanctioned religious activity. The school district recognizes that it may not do these things and does not appeal this portion of the injunction. The injunction also forbids the school district from "permitting" students to speak religiously in any sort of public context. This it cannot constitutionally do. The Permanent Injunction may neither prohibit genuinely student-initiated religious speech, nor apply restrictions on the time, place, and manner of that speech which exceed those placed on students' secular speech.[5]

Accordingly, we reaffirm our opinion and reinstate our judgment in *Chandler I.* The case is REMANDED to the district court for further proceedings not inconsistent with this opinion.

---

[5]The district court had before it a great deal of information concerning prior actions of school personnel indicating a majoritarian purpose to foster one particular religion. Indeed, it was because of this record that we affirmed the appointment of a monitor. *See Chandler I,* 180 F.3d at 1265. We had no occasion, then or now, to inspect any specific activity of students *permitted* to speak religiously. Nor shall we speculate. Should the permission we now hold to be required be transformed into proselytizing by school personnel, the monitor can bring that to the court's attention. We shall not assume that those enjoined will not abide the injunction.